IN THE SUPREME COURT OF THE STATE OF DELAWARE

ISRAEL LECOMPTE, § 
§ No. 454, 2024
Defendant Below, §
Appellant, § Court Below–Superior Court
§ of the State of Delaware
v. §
§ Cr. ID Nos. 2107004126A&B (N)
STATE OF DELAWARE, § 2109003432A&B (N)
§
Appellee. §

Submitted: July 3, 2025
Decided: September 15, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **GRIFFITHS**, Justices.

## <u>ORDER</u>

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the appellee's response, and the Superior Court record, it appears to the Court that:

(1)     In July 2021, a Superior Court grand jury indicted the appellant, Israel Lecompte, an alleged member of a street gang known as "NorthPak," for gang participation and numerous violent crimes. The charges against Lecompte in the operative reindictment included gang participation, two counts of first-degree murder, ten counts of attempted first-degree murder, four counts of first-degree robbery, eleven counts of first-degree reckless endangering, four counts of receiving

stolen property, theft of a motor vehicle, and multiple conspiracy and firearm-related offenses.

(2)     Lecompte's charges arose from an ongoing investigation into NorthPak and its suspected involvement in a series of violent crimes in the City of Wilmington. Investigators determined that NorthPak was a "hybrid criminal street gang" with "no clear code of conduct or rank structure" typically confined to a specific geographical location.[1]     NorthPak used social media platforms like Instagram to "establish territory," "disrespect opposing gang members," "pay homage to fellow deceased gang members or associates," "post guns," and promote "the gang itself."[2] Investigators believed the gang formed in 2018, when they first observed social media posts tagged with the monicker "NorthPak."  NorthPak's territory was "on the north side of the city[,] from 24th to 30th Streets, from Market all the way up to about Washington."[3]

(3)     In the summer of 2021, NorthPak was feuding with rival Wilmington gangs, including the M-Block Grimy Savages ("MGS") and Chase the Bag ("CTB").[4]     NorthPak also considered the Riverside and Southbridge areas of Wilmington to be "opposing" territories.[5]  Gang members followed opposing gang

---

[1] App. to Opening Br. at A182.
[2] *Id*. at A178.
[3] *Id*. at A137-38, A1636.
[4] *Id*. at A1639-1640.
[5] *Id*. at A1640, A1682-83, A2238, A2241, A2353.

members on Instagram, and would often taunt or "troll" each other by, among other things, posting from within an opposing gang's territory and showing disrespect to an opposing gang's murdered members.[6] A person who taunted opposing gang members or showed allegiance to a particular gang member could become a target for an opposing gang.[7] NorthPak gang members would frequently steal cars to "spin the block," a slang term meaning to drive around an opposing gang's territory, looking for targets.[8] Anyone associated with MGS could be considered a target for NorthPak.[9] If the opportunity arose, NorthPak would do a "drill," a slang term for a shooting.[10] Gang members kept "score" of the number of deaths on each side,[11] and it was common practice for members to brag to others about their hits.[12] In June 2021, most of the original NorthPak members had been indicted for gang participation (and related crimes) and were incarcerated; Lecompte was not.[13]

(4)    Several violent attacks resulted in Lecompte's convictions at issue in this appeal. The first two occurred on June 30, 2021. At approximately 3:40 p.m., a Door Dash delivery worker left the engine running in her 2007 Toyota Avalon

---

[6] *Id*. at A2228.
[7] *Id.* at A2256, A2236, A2273, A1637-38.
[8] *Id*. at A2250.
[9] *Id*. at A2241.
[10] *Id*. at A1636-37, A2444-45.
[11] *Id*. at A2256, A2350.
[12] *Id*. at A2446-47, A2482.
[13] *Id*. at A1642-43.

while she delivered an order to a home in New Castle. When she turned back to her car, she saw three young Black men get into the Avalon and speed off. The Avalon, which was low on gas, was equipped with a GPS tracker and an ignition-locking device. The Avalon was tracked to a Wawa gas station on Naamans Road in Claymont. Surveillance video from the Wawa showed the Avalon pulling up to a gas pump at 4:16 p.m. and three Black men—the driver, wearing a black shirt and carrying a satchel across his chest, and two passengers, wearing red and white shirts, respectively—exiting the car and entering the Wawa, where the man in the black shirt made a purchase with his cell phone. Several minutes after the three men returned to the Avalon, the surveillance video showed them leaving the Wawa parking lot on foot—presumably, after being unable to restart the Avalon—in the direction of Society Drive.

(5) Surveillance video from the Naamans Village Apartments, located directly across Society Drive from the Wawa, showed the same three Black men— the man in the black shirt and satchel now with a gray sweatshirt draped over his body—enter the apartment complex. A Naamans Village Apartments resident reported that at approximately 4:40 p.m., three Black men approached her in the apartment parking lot, and one of the men gestured toward a bag he was carrying as he demanded the keys to her gray Honda Accord. At trial, the victim testified that she feared that the man who took her keys was armed and identified the men in the

4

surveillance video as the men who robbed her. The Accord was eventually recovered in a parking lot in Philadelphia—the same parking lot where a black Nissan Maxima was reported stolen on July 1, 2021, around 9:10 p.m.

(6) The third event took place on July 2, 2021, when Quinton Dorsey was murdered. Around 6:20 p.m., Dorsey, a well-known entrepreneur of the clothing brand "Bag Season" and a potential NorthPak target because he was friends with several MGS gang members and had honored fallen MGS gang members in social media posts,[14] was sitting on the front steps of 917 North Lombard Street with his grandmother, Deborah Cleveland,[15] and his young cousins. Deborah testified that a black car pulled up and two armed Black men—the driver, wearing a gray sweatshirt, and his passenger, a shorter man wearing all black—jumped out. The man in the gray sweatshirt pushed Deborah aside and shot Dorsey multiple times in the head at point-blank range. The two men then leapt back into the black car and fled. Dorsey's fourteen-year-old sister also witnessed the shooting and called 911, describing the shooter as a Black male wearing a gray hoodie. Dorsey's grandfather, Marshall Cleveland, was inside the house when the shooting took place but ran to the front door when he heard gunfire. Marshall testified that the shooter was a Black male with a distinctive eyebrow—with what looked like razor marks running

---

[14] *Id.* at A2366-70, A2379, A2478.

[15] For clarity, we refer to Dorsey's grandparents by their first names. We intend no familiarity or disrespect.

5

through it—who was wearing a hoodie and a face mask. Police found eight spent shell casings at the scene. Deborah identified Lecompte as the shooter from a six-person lineup within hours of the shooting.

(7) Surveillance video captured the car used by the assailant as it approached 917 Lombard: at 6:19 p.m., City Watch camera footage showed a black Nissan with heavily tinted windows traveling down 10th Street toward Lombard; and a still photograph from a residential camera located at 925 Lombard Street captured the same black vehicle traveling eastbound toward 917 Lombard moments before the shooting.

(8) Several more violent events took place on July 4, 2021. Around 6:45 a.m., a woman was robbed at gunpoint of approximately $500 in cash at the Sunoco gas station at 30th and Market. The robbery was captured on the Sunoco's surveillance video, which showed two Black men, one wearing a red-and-black hoodie and the other a navy "Gap" hoodie, exit a black car with heavily tinted windows, approach the victim, take something from her, and flee in the vehicle. Two hours later, a twelve-year-old was robbed at gunpoint on 35th Street. The robber, described as a Black male wearing a red hoodie and black pants, first approached the twelve-year-old while driving a black vehicle with tinted windows and then returned on foot and robbed the child at gunpoint. A residential camera captured a

6

black vehicle with tinted windows driving by the scene and, minutes later, a man in a red-and-black sweatshirt fleeing on foot toward a nearby alley.

(9)    Shortly thereafter, at 9:02 a.m., police received a 911 call reporting that a Black male wearing a red-and-black sweatshirt was shooting indiscriminately at the corner of 30th and Tatnall Streets.  A resident reported to a responding officer that he had noticed an unfamiliar black car with tinted windows and Pennsylvania tags pull up nearby and heard shooting shortly thereafter.  Police recovered five spent shell casings from the scene.  The ballistics evidence showed that the shell casings found at the 30th and Tatnall crime scene and the shell casings found at the Dorsey murder scene—all 9 mm Luger with a Blazer headstamp—were fired from the same firearm.  In two live videos posted to Lecompte's Instagram account during the evening hours of July 4, Lecompte could be seen wearing a black headwrap and a red-and-black Bag Season hoodie. On July 6, the twelve-year-old robbery victim identified Lecompte as his robber from a six-person lineup.

(10)   More tragedy followed.  At approximately 10:40 a.m. on July 5, Matima Miller, a successful TikTok entrepreneur and a potential NorthPak target because he was from the Southbridge neighborhood,[16] was shot at point-blank range as he and his roommate returned home from picking up breakfast at McDonald's. The shooter made eye contact with Miller's roommate, who was standing right next

---

[16] App. to Opening Br. at A2481.

to Miller, before shooting Miller. Miller's roommate described the shooter as a Black male carrying a black gun and wearing a red-and-black "Bag Season" hoodie and a ski mask. Within hours of the shooting, Miller's roommate sent Miller's older brother, Rahkim, a picture of Lecompte and identified him as Miller's shooter. On July 14, 2021, Miller's roommate spoke with police and identified Lecompte as the shooter from a six-person lineup. Multiple witnesses saw a black car with heavily tinted windows at the scene, and surveillance video from a BP gas station camera and three City Watch cameras captured a four-door black car with tinted windows approaching the scene prior to the shooting and leaving the scene immediately afterward.

(11) The stolen black Maxima was recovered on July 7, 2021, in Knollwood, a NorthPak-friendly territory, and processed for evidence. Lecompte's fingerprint was found on the exterior of the driver's side door and two 9 mm Luger cartridges were recovered from the interior of the car. The owner of the stolen Maxima testified that the Maxima had unique 19-inch black rims, a spoiler, and custom dark tinted windows. He identified as his the black Maxima shown in still shots from the Sunoco surveillance video, the Lombard Street residential camera footage, the 35th Street residential camera footage, and the City Watch camera footage taken at the intersection of D Street and South Heald Street after the Miller murder.

(12) The sequence of tragic events came to a dramatic end following several violent crimes that took place on July 10, 2021. At about 3:30 a.m., a Wilmington resident was returning to his home on West 39th Street when two Black males, one of whom was described as wearing black gloves and a black jacket with a reflective strip on its back, stole his 2020 silver Nissan Maxima. The male wearing the black jacket pointed a silver handgun in the victim's face, took roughly $200 in cash from the victim's pocket, and threatened to kill the victim if he came looking for them. Roughly 30 minutes later, at 4 a.m., Lecompte posted an Instagram live video in which he could be seen wearing a black headband and a black jacket with a white emblem on the left chest and distinctive white drawstrings. The video showed Lecompte driving recklessly down a highway, as evidenced by images of green highway signs passing by quickly in the background and a view of the car's speedometer, at which Lecompte pointed the camera and which reflected that he was driving over 100 mph. Two hours later, Lecompte posted another Instagram live video from the inside of a vehicle in which Lecompte could be seen wearing the same black jacket and during which Lecompte stated that he "got TJ in some sh*t."[17] The silver Maxima was recovered in Northeast Philadelphia on July 18.

(13) Around 7:30 a.m., a red Chrysler 300 with heavily tinted windows and Pennsylvania tags was stolen from a LuKoil gas station in Chester, Pennsylvania.

---

[17] *Id*. at A1603.

9

Back in Delaware, at roughly 4:15 p.m., police receive an anonymous call reporting that shots had been fired in the area of the 600th block of North Jefferson Street. The caller reported that the suspect fled in a red Chrysler 300 with tinted windows. Surveillance video from a liquor store on Jefferson Street captured a red Chrysler coming to a stop in front of the store and three individuals wielding guns exiting the vehicle. Pedestrians on the busy street scattered. Two of the armed men, one of whom wore a jacket with distinctive white drawstrings, appeared to chase someone out of range of the video, and the third shot in the direction of the liquor store. The men quickly regrouped and fled in the Chrysler. Two 9 mm shell casings and two .380 caliber shell casings were recovered from the scene.

(14) Shortly after the shooting, police spotted a red Chrysler 300 with tinted windows at the intersection of 25th Street and North Market Street and pursued it. The Chrysler led police in a high-speed chase onto Interstate 495, a chase that continued past congested traffic and onto the shoulder of the interstate where the Chrysler ultimately collided with a stopped Nissan Rogue—injuring the six occupants of the Rogue—and came to a stop. The Chrysler's occupants fled. Two occupants immediately ran to the adjacent tree line. One occupant, wearing all black, ran along the guardrail before leaping over it and running into the adjacent woods. Police soon apprehended a shirtless and sweaty man—later identified as Quincy Lee—in a nearby residential area.

10

(15) The Chrysler was processed for evidence. Lecompte's cell phone, Lecompte's driver's license, a loaded 9 mm handgun, a box of disposable blue latex gloves, and a spent shell casing from a .380 caliber handgun were among the items found in the Chrysler. Lecompte's fingerprint was found on the Chrysler's exterior gas lid. A loaded silver Smith & Wesson handgun was later discovered wedged in the center console.

(16) A search of Lecompte's phone uncovered more incriminating evidence: a photograph of Lecompte wearing a gray sweatshirt on June 29; a receipt from Wawa for a $10 purchase made on June 30 at 4:19 p.m.; a notification that Lecompte's phone had connected to a Nissan's CarPlay system at 9:13 p.m. on July 1 (one minute after the black Maxima was reported stolen in Pennsylvania); videos taken at 3:29 a.m. and 11:42 p.m. on July 4 in which Lecompte could be seen wearing a red-and-black "Bag Season" sweatshirt; a video taken on July 6 in which Lecompte could be seen wearing a black headwrap and a black "Snipes" hoodie and during which he palmed a silver handgun; and a video taken at 10 a.m. on July 10 in which Lecompte could be seen seated in the interior of the stolen red Chrysler 300. An extraction summary from Lecompte's phone also showed that Lecompte had run internet searches for various NorthPak affiliates and members, including himself, on June 21.

(17)  Among the more than 60 witnesses who testified during the sixteen-day trial was former NorthPak affiliate Tyhir ("TJ") Fields Johnson.  Johnson testified that he was with Lecompte, who was armed with a silver 9 mm semi-automatic handgun, when they robbed the Wilmington resident of his Nissan Maxima on July 10 and during Lecompte's live Instagram stories posted early that morning.  Johnson confirmed that he and Lecompte took the Maxima to Philadelphia, where they left it, and that they returned to Wilmington in a stolen red Chrysler 300.  Johnson also testified to several conversations he had with Lecompte.  In the first, Johnson and Lecompte discussed the video of the Jefferson Street shooting, which had been circulating on social media.  Lecompte explained to Johnson that he and the other two men shown in the video were chasing someone who was associated with CTB and went by the nickname "Shifty."  Lecompte also told Johnson that they had been chased by the police after the shooting and had to abandon the Chrysler and he had left a silver 9 mm semi-automatic weapon (the same one used during the carjacking of the 2020 silver Maxima) in the car.   Johnson testified that on another occasion, prior to the July 10 crime spree, Lecompte laughed as he bragged about killing Miller, who, Lecompte claimed, had threatened to kill him because he had killed Dorsey.  Lecompte also boasted to Johnson that he killed Dorsey in front of his grandmother.  Finally, Johnson told the jury that Lecompte had asked him to dispose of a red-and-black "Bag Season" hoodie and other clothing because he had been

12

wearing them when he killed someone. Johnson took Lecompte's clothes and loaned him a black "Snipes" hoodie to wear.

(18) Quincy Lee, who knew Lecompte through their mutual friend, Zono Gathers, also testified. He told the jury that he, Gathers, and Lecompte went into Wilmington on July 10 to "shoot at people and stuff like that."[18] Lecompte drove them in a red Chrysler. All three men were wearing disposable latex gloves and were armed—Lee with a .380 caliber Smith & Wesson, Lecompte with a silver 9 mm handgun, and Gathers with a Glock ghost gun. Lecompte stopped the car on North Jefferson because they saw a person from the east side, "Shifty Leer." When they exited the car, Lecompte and Gathers chased Shifty, and Lee started "shooting at anybody."[19] Lecompte and Gathers ran back to the car, and Lee scrambled into the driver's seat and drove the car away before switching seats with Lecompte. The trio was planning to head to the east side of the city before the police found them and gave chase. After the Chrysler crashed into the Rogue, Lecompte, Lee, and Gathers split ways and ran. Lee also told the jury that earlier in the day, Lecompte had bragged to Lee that he had shot Dorsey in the head in front of Dorsey's grandmother.

---

[18] *Id*. at A1987.
[19] *Id*. at A1994.

13

(19)　Tyrie Burton, a former MGS member, testified, among other things, that he exchanged words with Lecompte in October 2023 when their paths crossed at the courthouse.  Lecompte told him that he was "smoking on" Dorsey—a slang phrase meaning "either … you killed them or somebody you be with killed him."[20]

(20)　Kyaire Finch, an inmate housed on the same pod as Lecompte at Howard R. Young Correctional Center in September 2022, testified that he overheard Lecompte apologizing to Miller's cousin, a NorthPak gang member, for killing Miller.

(21)　Stanley Jones, an original member of NorthPak, testified that Lecompte had bragged to him about killing Dorsey during a conversation Lecompte and Jones had in the booking-and-receiving room at Howard R. Young Correctional Institute.  Specifically, Lecompte boasted that he got out of the car to shoot Dorsey: "[He] was just bragging about how, like, if you shoot, like, if you do a drive-by, you're considered, like a coward, like, you were scared to get out…. So, he's just bragging, like, I got out [of] the car…. He actually got out and started shooting."[21]  Similarly, Lecompte also confessed to Jones that he killed Miller: "[I]f … the shoe was on the other foot, [MGS] would have did the same thing to us."[22]

---

[20] *Id*. at A2378.
[21] *Id*. at A2475.
[22] *Id*. at A2480.

14

(22) The jury found Lecompte guilty of gang participation and multiple violent crimes, including two counts of first-degree murder, four counts of first-degree robbery, one count of attempted first-degree assault, fourteen counts of first-degree reckless endangering, four counts of receiving stolen property, theft of a motor vehicle, and numerous conspiracy and weapons firearm-related offenses. The jury acquitted Lecompte of charges arising from a non-fatal shooting that took place on June 9, 2021. The Superior Court sentenced Lecompte to life in prison for each murder conviction and to a decades-long term of incarceration for the remaining convictions. This is Lecompte's direct appeal.

(23) On appeal, counsel has filed a brief and a motion to withdraw under Rule 26(c). Counsel asserts that, after a complete and careful examination of the record, he could not identify any arguably appealable issues. Counsel informed Lecompte of the provisions of Rule 26(c), provided him with a copy of the motion to withdraw and a draft of the accompanying brief, and informed him of his right to supplement his attorney's presentation. Lecompte has raised issues for the Court's consideration, which counsel attached to the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(24) The standard and scope of review applicable to the consideration of a motion to withdraw and an accompanying brief under Rule 26(c) is twofold. First,

15

the Court must be satisfied that defense counsel has made a conscientious examination of the record and the law for claims that could be arguably raised on appeal. [23] Second, the Court must conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[24]

(25) Lecompte raises three arguments for the Court's consideration. First, Lecompte argues that there was insufficient evidence to support his conviction for Dorsey's murder. Similarly, Lecompte claims that the evidence was insufficient to support his conviction for Miller's murder. Finally, Lecompte questions the credibility of the State's gang expert.

(26) Lecompte did not seek a directed verdict or a judgment of acquittal for either first-degree murder charge in the Superior Court. "In the absence of a motion for directed verdict or for judgment of acquittal notwithstanding the verdict, this Court reviews claims of insufficient evidence for plain error."[25] "Plain errors are 'material defects' that are apparent on the face of the record and that are basic, serious, and fundamental in their character, and which clearly deprive an accused of

---

[23] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wis.*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).

[24] *Penson*, 488 U.S. at 81-82.

[25] *Swan v. State*, 820 A.2d 342, 358 (Del. 2003); *see Williamson v. State*, 113 A.3d 155, 157 (Del. 2015) ("[I]t is well-settled that in a jury trial, if a defendant fails to make a motion for acquittal to the trial court, the defendant has failed to preserve the right to appeal the issue of the sufficiency of the evidence to convict, and we ... apply the plain error standard of review.").

a substantial right, or which clearly show manifest injustice."[26]  As explained below, we find no plain error here.

(27)  The relevant inquiry when an insufficiency-of-the-evidence claim is raised is whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt.[27]  In making this inquiry, we do not distinguish between direct and circumstantial evidence.[28]  When the determinations of fact turns on a question of witness credibility, we will not substitute our opinion for that of the trier of fact.[29]

(28)  Here, the State charged Lecompte with intentionally causing Dorsey's death.  Lecompte claims that the evidence was insufficient to convict him of the first-degree murder of Dorsey because (i) Marshall Cleveland testified for the first time at trial that Lecompte had distinctive marks in his eyebrows, and (ii) Marshall testified that he had not seen a photograph of Lecompte before trial but Dorsey's sister testified that Marshall had, in fact, seen a photograph of Lecompte that accompanied a news article on Lecompte's arrest.

(29)  We conclude that there was more than adequate evidence to support Lecompte's conviction for the first-degree murder of Dorsey, including, among

---

[26] *Loper v. State*, 2020 WL 2843516, at \*2 (Del. June 1, 2020) (citation modified).
[27] *Robinson v. State*, 2025 WL 1303739, at \*5 (Del. May 6, 2025).
[28] *McMullen v. State*, 253 A.3d 107, 114 (Del. 2021).
[29] *O'Neal v. State*, 2024 WL 981384, at \*3 (Del. Mar. 6, 2024).

other evidence: (i) Deborah's identification of Lecompte from a lineup within hours of the shooting; (ii) surveillance video showing a stolen car that was ultimately discovered with Lecompte's fingerprint on the driver's side door approaching the site of the murder minutes beforehand; and (iii) the testimony of Lecompte's NorthPak associates and a MGS associate that Lecompte had bragged about killing Dorsey. With respect to Lecompte's specific claims, they relate to the credibility of Marshall's testimony and were competently explored by defense counsel on cross-examination. As noted, credibility determinations are left to the sound discretion of the jury. Viewing the evidence—direct and circumstantial—in the light most favorable to the State, we find it evident that a rational trier of fact could have found Lecompte guilty of Dorsey's murder beyond a reasonable doubt.

(30) The State similarly charged Lecompte with intentionally causing Miller's death. Lecompte argues that the evidence was insufficient to support his conviction for the first-degree murder of Miller because (i) Miller's older brother "made" Miller's roommate give a statement to police, and (ii) Miller's roommate's identification of Lecompte was "suggestive." A review of the transcript belies Lecompte's first claim: when the prosecutor asked Miller's roommate if anyone forced him give a statement to the police, Miller's roommate replied, "I was with Rahkim."[30] And Miller's roommate responded affirmatively when asked directly,

---

[30] App. to Opening Br. at A1521-22.

18

"When you spoke to Detective Kirlin, did you do so voluntarily?"[31]   And while Miller's roommate appeared to be a reluctant witness, it was up to the jury to weigh the credibility of his testimony.  Lecompte's second claim seems to be premised on the fact that the picture associated with the Instagram profile that Miller's roommate shared with Rahkim was not of Lecompte.  But the profile itself was associated with Lecompte, and Miller's roommate identified Lecompte as the shooter in pictures on social media as well as from the police-generated six-pack lineup.  Moreover, we conclude that there was more than adequate evidence to support Lecompte's conviction for Miller's murder, including, among other things: (i) Miller's roommate's identification of Lecompte as Miller's shooter to Rahkim within an hour of the shooting; (ii) multiple surveillance videos showing a car consistent with the eyewitnesses' descriptions of the car driven by the shooter—and from which Lecompte's fingerprint was later found—approaching the murder site minutes before the shooting and departing immediately after the shooting; and (iii) the testimony of Lecompte's NorthPak associates and a fellow prison inmate that Lecompte had bragged about killing Miller.  That is, viewing the evidence—direct and circumstantial—in the light most favorable to the State, we conclude that a rational trier of fact could have found Lecompte guilty of Miller's murder beyond a reasonable doubt.

---

[31] *Id*. at 1522.

19

(31)    Finally, Lecompte claims that the State's gang expert, Daniel Masi, misidentified him in Exhibit 58.  We construe this claim to be an objection to Masi's qualification as an expert.  Because Lecompte did not object to Masi's qualifications below, we also review this claim for plain error.[32]  There is no plain error here.  The Court has read the trial transcripts and examined the exhibits carefully.  Although the State used Masi to explain to the jury how NorthPak operated, in general, and how certain social media posts could be perceived as slights worthy of retribution, in particular, the vast majority of Masi's testimony was duplicative—gang members and associates, themselves, testified to NorthPak's method of operation.  And Masi's failure to identify Lecompte in one photograph, in which the subjects were all wearing masks, does not meaningfully call into question his qualifications to testify as an expert witness on gang culture.

(32)    The Court has reviewed the record carefully and has concluded that Lecompte's appeal is wholly without merit and devoid of any arguably appealable issues.  We are also satisfied that Lecompte's counsel has made a conscientious effort to examine the record and the law and has properly determined that Lecompte could not raise a meritorious claim in this appeal.

---

[32] Del. Supr. Ct. R. 8.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.  Counsel's motion to withdraw is moot.

BY THE COURT:


/s/ Collins J. Seitz, Jr.
Chief Justice